717 So.2d 1112 (1998)
Martha Cesery TAYLOR, Appellant,
v.
William R. CESERY, Jr., individually, as Personal Representative of the Estate Vesta H. Cesery, and as Trustee of the Vesta H. Cesery Amended and Restated Living Trust; and Barbara H. Cesery, individually, Appellees.
No. 98-508.
District Court of Appeal of Florida, First District.
September 28, 1998.
*1113 Cindy A. Laquidara of Laquidara, Edwards, Cohen & Jacobs, P.A., Jacksonville, for Appellant.
Stephen B. Busey and James J. Taylor, Jr. of Smith, Hulsey & Busey, Jacksonville for William R. Cesery, Jr., for Appellees.
LAWRENCE, Judge.
Martha Cesery Taylor appeals from a nonfinal order in which the trial court denied her motion for temporary injunctive relief, and discharged her notice of lis pendens. We affirm in part and reverse in part.
Vesta Cesery died leaving three adult children, Martha Cesery Taylor (Martha), William Cesery, Jr. (William), and Barbara Cesery (Barbara). William was named trustee and executor of Vesta Cesery's multi-million dollar estate and intervivos trust (trust). The three adult children were named as principal beneficiaries. Among the assets of the trust is an oceanfront home in Ponte Vedra Beach (Ponte Vedra House), with an appraised value of $2,150,000. This property is the subject of the instant appeal.
The trust, in part, provides:
9. Trustee Powers. In addition to such powers as may be provided by law, the Trustee is fully authorized and empowered, subject to the provisions of Paragraphs 5(b)(iv) and 10 hereof, with respect to any and all property, real or personal, which may at any time be held in trust hereunder, whether as principal or income, in the Trustee's sole discretion without applying to any court for permission so to do or for instructions in regard thereto, as follows:
....
(c) To sell at public or private sale, grant options on, exchange or otherwise dispose of all or any part of such property or any interest therein at such time and upon such terms and conditions, including credit and long-term installment sales income.
William, as trustee, decided to sell the Ponte Vedra House in 1997. He first offered to sell the property to Martha, stating, in a letter dated May 9, 1997, that a cash price of $2,021,000 would be acceptable.[1] The letter stated that if Martha did not respond to the offer by May 13, 1997, the offer would terminate and William would attempt to sell the house to a third party, "subject to [Martha's] right of first refusal."[2] Martha did not accept William's offer.
William, by letter dated October 16, 1997, informed Martha that he had received a firm offer from a third party, the Cleggs, to purchase the Ponte Vedra House for a cash price of $2,450,000, and that he intended to accept the offer unless he could negotiate a higher price with the buyers. William offered Martha the opportunity "to purchase the property on the same terms and conditions *1114 as contained in the [contract with the Cleggs]." William also offered Martha the chance to purchase the house for the price of $2,021,000 subject to an agreement by Martha to release William and Barbara from any claims and to waive objections with regard to administration of the estate. Martha, on October 23, 1997, notified William that instead of paying cash for the house, she would prefer to receive the Ponte Vedra House "as part of her estate distribution."
William, on October 24, 1997, entered into a binding contract with the Cleggs to sell the Ponte Vedra House for $2,500,000. The Clegg contract was made subject to a right of first refusal in Martha's favor.
Martha, on November 7, 1997, notified William that she wished to exercise her right of first refusal to purchase the Ponte Vedra House "on the same terms as the proposed sale to Mr. and Mrs. Clegg," but again proposed that she receive the house "as a distribution from the estate" rather than pay the cash price for the house. Martha asserted that receiving the house in the form of an estate distribution was "economically equivalent to a cash offer...." William acknowledged receipt of Martha's letter but stated that receiving a distribution of the Ponte Vedra House was not the equivalent of a cash offer. He further informed Martha that because she had failed to timely match the offer made by the Cleggs, the property would be sold to the Cleggs. Martha subsequently filed an objection and alternative motion for temporary injunction to enjoin the sale of the Ponte Vedra House to the Cleggs, accompanied by a lis pendens describing the Ponte Vedra House. William moved for discharge of the lis pendens. The trial court, finding that Martha had not validly exercised her right of first refusal, denied Martha's motion for temporary injunction and granted William's motion to discharge the lis pendens. We affirm the denial of the temporary injunction, but reverse the trial court's order dissolving the lis pendens.
This court holds, with regard to a grant of a temporary injunction:
[T]he issuance of a preliminary injunction is an extraordinary remedy which should be granted sparingly, which must be based upon a showing of the following criteria: (1) The likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) substantial likelihood of success on the merits; and (4) considerations of the public interest.
Thompson v. Planning Comm'n of the City of Jacksonville, 464 So.2d 1231, 1236 (Fla. 1st DCA 1985). Martha, in the instant case, has failed to demonstrate a substantial likelihood of success on the merits. "A right of first refusal is a right to elect to take specified property at the same price and on the same terms and conditions as those contained in a good faith offer by a third person if the owner manifests a willingness to accept the offer." Pearson v. Fulton, 497 So.2d 898, 900 (Fla. 2d DCA 1986). Martha's right of first refusal ripened into an option when William "manifest[ed] a willingness to accept a good faith offer [from the Cleggs]." Id. As the court in Coastal Bay explained, "[o]ne who owns property has a right to dispose of that property in any lawful way he chooses." Coastal Bay Golf Club, Inc. v. Holbein, 231 So.2d 854, 858 (Fla. 3d DCA 1970). William, as trustee, chose to sell the Ponte Vedra House for a cash price of $2,500,000,[3] and Martha did not make an equivalent cash offer for the house. Martha thus failed to exercise her right of first refusal in a timely manner. Accordingly, the trial court did not err in denying temporary injunctive relief and we affirm its ruling on this issue.
The Florida Supreme Court, with respect to a lis pendens, in Chiusolo v. Kennedy, 614 So.2d 491 (Fla.1993), explained:
One of several purposes underlying the doctrine of lis pendens is that, when a suit is filed that could affect title in property, some notice should be given to future purchasers or encumbrancers of that property. *1115 This serves the purposes of protecting those purchasers or encumbrancers from becoming embroiled in the dispute, and of protecting the plaintiff from intervening liens that could impair any property rights claimed and also from possible extinguishment of the plaintiff's unrecorded equitable lien. In sum, unlike a typical injunction, a lis pendens exists as much to warn third parties as to protect the plaintiff; and the procedural requirements associated with lis pendens should advance both of these important purposes.
Id. at 492 (footnote and citation omitted). The court further explained that:
[a] lis pendens cannot be dissolved if, in the evidentiary hearing on request for discharge, the proponent can establish a fair nexus between the apparent legal or equitable ownership of the property and the dispute embodied in the lawsuit. To this end, the trial court need not determine whether there is any likelihood the property will be alienated or subjected to intervening liens during the pendency of the cause. The relevant question is whether alienation of the property or the imposition of intervening liens, if either actually occurred, conceivably could disserve the purposes for which lis pendens exists. Where the answer is yes, fair nexus must be found.
Id. (footnotes omitted, emphasis added). The court added that "it is possible for the property holder to obtain discharge of the lis pendens where sufficient measures have been taken to protect the interests claimed by the plaintiff, in the event those interests ultimately prove to be valid." Id. at n. 3. For example, where a plaintiff files a lis pendens, the "property holder[][may] ask in an appropriate case that the plaintiff post a bond where needed to protect the [property holder] from irreparable harm." Id. at 493.
Because the trial court's ruling was on a temporary motion and the record indicates that there are various unresolved factual issues which could conceivably affect the disposition of the Ponte Vedra House at final hearing, we reverse the order discharging the lis pendens. We do so without prejudice however, for the trial court to consider whether a bond or other measure to protect the parties' interests would be appropriate.
Accordingly, we affirm denial of the motion for temporary injunctive relief and reverse the order discharging the lis pendens.
AFFIRMED in part and REVERSED in part.
JOANOS, J. and SHIVERS, DOUGLASS B., Senior Judge, concur.
NOTES
[1] The price of $2,021,000 represented the appraised value of the Ponte Vedra House minus a six percent sales commission.
[2] It is undisputed that William had given Martha a right of first refusal to buy the Ponte Vedra House.
[3] William, as trustee, has an obligation "to administer [the] trust diligently for the benefit of the beneficiaries[.]" § 737.301, Fla. Stat. (1997). There is no indication that attempting to sell the Ponte Vedra House constituted poor administration of the trust. In fact, the estate had not at the time even received a final audit from the Internal Revenue Service as to its liability for estate taxes.